## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

CARMEN MERCADO VELILLA,

      Plaintiff,

          v.                                        CIVIL NO.: 08-1275 (JAG)

ASOCIACIÓN HOSPITAL DEL MAESTRO, et.
al.,

      Defendants.

## REPORT AND RECOMMENDATION

      Carmen Mercado Velilla ("Mercado" or "plaintiff"), a citizen of California, filed the instant diversity action against Asociación Hospital del Maestro, Inc., Presbyterian Community Hospital, Dr. Carlos González Fuentes, Dr. Wanda Ramos Vélez, and Dr. José Pérez López, as well as the doctors' spouses and conjugal partnerships and various insurance companies, alleging medical malpractice for failure to obtain her informed consent before treating her with the medication Prednisone.   (D.E. 1).   Pending before the court are two motions for summary judgment: one filed by Presbyterian Community Hospital ("PCH" or "the hospital"), whose emergency room physicians treated plaintiff on four occasions, and another filed by Dr. Wanda Ramos Vélez ("Dr. Ramos"), one of those emergency room physicians, and her insurer, Triple-S Propiedad.   (D.E. 137, 139).[1]   Plaintiff has filed responses in opposition to both motions (D.E. 168, 172), PCH has filed a reply, which Dr. Ramos has joined (D.E. 175, 176, 179), and plaintiff has filed a surreply (D.E. 178, 180).   Both motions seek summary judgment on the claim as

---

[1] For simplicity's sake, the court omits all further references to Triple-S Propiedad and treats its insured, Dr. Ramos, as if she were the sole defendant with respect to her motion.

stated in plaintiff's third amended complaint.  For the reasons set forth below, it is respectfully recommended that both motions be denied.

## I.     SUMMARY OF UNCONTESTED FACTS

The majority of the parties' proposed facts are common to both motions and will therefore be summarized jointly, unless otherwise indicated.[2]   After applying Local Rule 56, the facts of the case for purposes of these motions are set forth below.[3]

Plaintiff was diagnosed with colitis in 1998 and, at some time between 1999 and 2000, she was diagnosed with ulcerative colitis at a hospital in New York City.  (D.E. 136, ¶¶ 1, 2; D.E. 140, ¶¶ 1, 2; D.E. 167, ¶ 1, D.E. 169, ¶ 1).   Her condition caused her to suffer constant stomach pain and frequent bloody diarrhea.  (D.E. 136, ¶ 3; D.E. 140, ¶ 3; D.E. 167, ¶ 1; D.E. 169, ¶ 1).   Plaintiff does not remember if the physicians who diagnosed her in New York City gave her Prednisone. (D.E. 136, ¶ 4; D.E., 167 ¶ 1).

At some point in 2001, plaintiff was hospitalized at Daniel Freeman Marina Hospital in Marina del Rey, California, for eight to ten days.  (D.E. 136 ¶ 6; D.E. 167 ¶ 1).  There, she was given Prednisone to treat her ulcerative colitis.  (D.E. 136 ¶¶ 5, 6; D.E. 167 ¶ 1).  The physician

---

[2] Dr. Ramos's paragraphs of proposed facts are numbered 1-21 (D.E. 140) and the hospital's proposed facts are numbered 1-68 (D.E. 136).  Both defendants' proposed facts numbered 1-3 are identical.  Dr. Ramos's proposed facts numbered 4-20 are identical to the hospital's proposed facts numbered 44-60, and Dr. Ramos's proposed fact number 21 is the same as the hospital's proposed fact number 68.  Plaintiff's responses in opposition to both sets of common facts are also identical.

[3] Local Rule 56 "structures the presentation of proof at summary judgment." Goya Foods, Inc. v. Orion Distributors, Inc., Civil No. Civil No. 10-1168 (BJM), 2012 WL 1069191, at * 1 (D.P.R. Mar. 29, 2012).  It "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," CMI Capital Market Inv. v. González Toro, 520 F.3d 58, 63 (1st Cir. 2008), by requiring "a party opposing a motion for summary judgment to accept, deny, or qualify each entry in the movant's statement of material facts paragraph by paragraph and to support any denials, qualifications, or new assertions by particularized citations to the record." Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 6-7 (1st Cir. 2007).  In accordance with Local Rule 56(e), all proposed facts that are properly supported by record evidence and have not been successfully controverted or qualified by the opposing party have been deemed admitted.  Likewise, the court has disregarded any proposed facts that are not supported by the cited record evidence.  See Local Rule 56(e) (requiring all facts to be supported by a specific record citation).  Additionally, there are certain points that neither party has represented accurately in their opposing statements of proposed facts.  In those instances, the court has derived the correct reflection of the fact in question directly from the summary judgment record.

who prescribed the Prednisone did not tell plaintiff anything about the medication, nor did anyone else at the Daniel Freeman Hospital inform her of Prednisone's possible side effects. (D.E. 136 ¶ 7; D.E. 167 ¶ 1).  Upon discharge from Daniel Freeman Hospital, Mercado was given a prescription of Prednisone to use for 2 to 3 weeks.  (D.E. 136 ¶ 8; D.E. 167 ¶ 1).

During the year 2002, plaintiff took Prednisone for a brief time period and she stopped because she was exploring alternative and holistic treatments.  (D.E. 136 ¶ 11; D.E. 167 ¶ 3; D.E. 167-2, p. 91, l. 11-19).  The record does not indicate during the exact time period in 2002 during which plaintiff was taking Prednisone.  However, on November 12, 2002, when plaintiff visited Saint John's Hospital in Santa Monica, California, she was taking Prednisone daily.  D.E. 136 ¶ 10; D.E. 167 ¶ 3; D.E. 136-2).  Plaintiff was admitted to Saint John's hospital principally because of an anal fissure that she had developed, but she was also treated there for her ulcerative colitis. (D.E. 136 ¶ 9; D.E. 167 ¶ 2, D.E. 167-2, p. 4, l. 1-5).

On December 29, 2002, plaintiff went to the emergency room of the defendant hospital, PCH, with symptoms of strong abdominal pain, bloody diarrhea and nausea.  (D.E. 136 ¶ 12; D.E. 167 ¶ 1).  Plaintiff remained at PCH through December 31, 2002.  In the emergency room, she was evaluated by co-defendant Dr. Carlos R. González Fuentes ("Dr. González"), an internal medicine specialist.  (D.E. 136 ¶ 13; D.E. 167 ¶ 1).  Dr. González treated plaintiff because he was in the roster of the PCH emergency room and was on call at that time.  (D.E. 167, ¶¶ 51-52; D.E. 175, ¶ 51-52).  In a consultation report dated December 29, 2002, Dr. González noted that plaintiff was treating her condition with Asacol and Prednisone.  (D.E. 175-1, p. 12).

During her hospitalization, Dr. González ordered that plaintiff be given Solumedrol intravenously, but he did not administer Prednisone.  (D.E. 136 ¶ 15, D.E. 167 ¶ 6).[4]  On

---

[4] Solumedrol is a steroid medication that has the same effect as Prednisone, but is taken intravenously rather than orally.  (D.E. 167 ¶ 50, D.E. 182-1, p. 3, l. 6-18).

December 31, plaintiff still had mild diarrhea, but she asked to be discharged because she wanted to be home that day.  (D.E. 136 ¶ 16; D.E. 167 ¶ 7; D.E. 175-1, p. 14).  Upon discharge, Dr. González gave Mercado a prescription for Prednisone because he believed that if she did not take it, "a suprarenal catastrophe could occur."  (D.E. 136 ¶ 17; D.E. 136-3 p. 45-46; D.E. 167 ¶ 8).[5] He advised her to see her gastroenterologist and continue her medication or to see if her gastroenterologist would consider a change in her medications.  (D.E. 136 ¶ 18; D.E. 167 ¶ 1). He also told her to return to the hospital if her condition got worse.  (D.E. 136 ¶ 17; D.E. 136-3 p. 45-46; D.E. 167 ¶ 8).

The next day, on January 1, 2003, Mercado returned to the PCH emergency room with complaints of rectal bleeding, diarrhea, nausea and abdominal pain.  (D.E. 136 ¶ 20; D.E. 167 ¶ 1).  Prior to her arrival, she was using Prednisone.  (D.E. 136 ¶ 21; D.E. 167 ¶ 1).  During that hospitalization, Dr. González treated plaintiff with Solumedrol until January 8, 2003, at which point he switched her to 40 milligram daily doses of Prednisone upon plaintiff's gastroenterologist's order.  (D.E. 136 ¶ 22, D.E. 167 ¶ 10).  Plaintiff remained at PCH until January 10, 2003.  Upon discharge, Dr. González prescribed her 40 milligrams of Prednisone per day and a medication called Pentasa, once again following the gastroenterologist's recommendation.  (D.E. 136 ¶ 23; D.E. 167 ¶ 11).

At some point during her hospitalization at PCH in either December of 2002 or January of 2003, plaintiff recalls that she told Dr. González that she had used Prednisone before.  (D.E. 167-6, p. 2, ¶ 6).  Dr. González does not remember if he discussed the side effects of Prednisone with plaintiff.  (D.E. 167, ¶ 55; D.E. 175, ¶ 55).  He never offered plaintiff 6

---

[5] As explained by Dr. González at his deposition, a patient that has been taking Prednisone for many years should not have that medication discontinued because it may cause adrenal suppression or even death.  (D.E. 136-3, p. 45-46).  When asked whether he ordered plaintiff to use the Prednisone he prescribed he stated: "Of course.  Otherwise, I'd kill her."  (D.E. 136-3, p. 46, l. 1-4)

Mercaptopurine ("6MP") or Embrel, alternative medications, because "those are medications used by subspecialists.  They are not used by the internal physicians."  (D.E. 167, ¶ 62; D.E. 175, ¶ 62).  Furthermore, according to Dr. González, Embrel is a drug that is to be used at the chronic level, but not at the acute level.  Id.

On January 20, 2003, plaintiff was admitted again to Saint John's Hospital in Santa Monica, where she was diagnosed with chronic ulcerative colitis and a perianal abscess/ fistula. (D.E. 136 ¶ 25; D.E. 167 ¶ 1).  At the time of her admission, plaintiff reported that she was taking 20 milligrams of Prednisone per day.  (D.E. 136 ¶ 26; D.E. 167 ¶ 13; D.E. 136-4).  During that hospitalization, plaintiff was treated with intravenous drugs, including Solumedrol.  (D.E. 136-5, p. 1).  She had surgery to remove the anal fistula and remained at Saint John's Hospital until January 27, 2003.  Id.  Mercado was treated with 40 milligrams of Prednisone daily following the surgery.  (D.E. 136 ¶ 27; D.E. 167 ¶ 1).  She also was given a prescription for Prednisone upon her discharge.  Id.  She was instructed to begin with 20 milligrams in the morning and 10 milligrams at night and to eventually reduce the dosage to 5 milligrams every other day.  (D.E. 136 ¶ 28; D.E. 167 ¶ 1).

On July 30, 2003, Mercado went to Daniel Freeman Marina Hospital in Marina del Rey, California, because she was having bouts of diarrhea.  (D.E. 136 ¶ 29; D.E. 167 ¶ 1).  Upon admission to that hospital, the doctor noted that plaintiff had a history of ulcerative colitis, but was not taking any medications.  (D.E. 136-6).  She was going to be treated with steroids, but she refused them and so she was given antibiotics.  (D.E. 136, ¶ 30, D.E. 167 ¶ 14, D.E. 136-6). That same day, her condition improved, and she asked to be discharged so that she could travel to Puerto Rico for her parents' anniversary.  Id.  Plaintiff was advised not to leave the hospital, and was warned that if she left against medical advice, she would put herself at risk of death,

bleeding, infection, and sepsis.  (D.E. 136 ¶ 31; D.E. 136-6; D.E. 167, p. 5-6 ¶ 15).  After receiving the warnings, plaintiff still wanted to be discharged.  Id.  The doctor who attended her noted that: "She did request Prednisone and stated that she would follow up with her doctors in Puerto Rico, however, given the fact that this is a toxic medication, and the plaintiff's compliance is not for sure, I have discussed that to arrive first thing tomorrow morning in Puerto Rico and obtain her medications from her family physician that she would be under the care of [sic]." (D.E. 136-6).  The record does not indicate whether plaintiff in fact obtained Prednisone once she arrived in Puerto Rico.

During the July 30, 2003 visit to the Daniel Freeman Marina Hospital, plaintiff also consulted with a gastroenterology specialist.  (D.E. 175-3).  She told him that she had been taking steroids on and off for the past couple of years and that every time she reduced her dosage of steroids she would get ill again.  (D.E. 175-3).  She also told the doctor that she had been advised to try 6MP, but she refused for fear of affecting her immune system.  Id.  The gastroenterologist had a long discussion with plaintiff regarding a treatment plan that included steroids plus Pentasa and 6MP.  Id.  She would start with 40 milligrams of Prednisone daily and taper down to 20 milligrams until the 6MP started to take effect.  Id.  Plaintiff said that she would consider it, but was adamant about leaving that night for Puerto Rico.  Id.

On August 16, 2003, Mercado went to Cedars Sinai Medical Center in Los Angeles, California, complaining of lower gastrointestinal bleeding.  (D.E. 136, ¶ 32; D.E. 167, ¶ 16; D.E. 136-7).  Those medical records reflect that she had been taking Prednisone 40 mg once a day prior to her admission.  (D.E. 136-7).  During that hospitalization, which lasted through Setpember 8, 2003, plaintiff was given Prednisone.  (D.E. 136 ¶ 34; D.E. 167 ¶ 1).  At Cedars Sinai Medical Center nobody told Mercado about the side effects of Prednisone.  Id.  When

plaintiff was discharged, she was prescribed various medications, including 25 milligrams of Prednisone per day. (D.E. 136, ¶ 35; D.E. 167, ¶ 17; D.E. 136-7).

From November 18, 2003 until November 21, 2003, Mercado was hospitalized once again at Cedars Sinai Medical Center, with complaints of rectal pain and diarrhea. (D.E. 136 ¶ 41; D.E. 167 ¶ 1). The medical records indicate that plaintiff had been reducing her dosage of steroids since she was discharged from the last hospitalization in September of 2003 and that she had been taking Prednisone since September of 2002. (D.E. 136-8). Plaintiff had reduced her dosage to five milligrams per day and then, a few days before she came to Cedars Sinai on November 18, 2003, had tried to decrease to 2.5 milligrams per day. Id. The treating physician's notes from that date state that plaintiff "says she has a lot of complaints with the Prednisone, including insomnia, mood swings, crying, and more psychiatric features associated with the side effects of steroids." Id. For that reason, she wanted to wean herself off of steroids. Id. A day or two after she had reduced to 2.5 milligrams per day, she began to have severe abdominal pain and severe diarrhea with abdominal bleeding. Id. The doctor concluded that plaintiff had suffered an exacerbation secondary to the reduction of her Prednisone. Id. To treat her, the hospital increased her Prednisone intake from 2.5 milligrams to ten milligrams, but the doctor noted that they would start a steroid enema or suppository since plaintiff was "so reluctant to take oral steroids." (D.E. 136 ¶ 43; D.E. 167 ¶ 1; D.E. 136-8).

From August 16 through August 20, 2004, plaintiff was hospitalized at PCH, where she was attended by co-defendant Dr. Ramos. (D.E. 136 ¶ 44; D.E. 140 ¶ 4; D.E. 167 ¶ 1; D.E. 169 ¶ 1). When plaintiff arrived at the emergency room on August 16, 2004, her chief complaints were abdominal pain, nausea, vomiting with blood, and bloody stools. (D.E. 136 ¶ 45; D.E. 167 ¶ 20). According to Dr. Ramos's notes from that date, plaintiff was not using any medications

for her colitis and she was reluctant to use steroids or to have any procedures such as colonoscopy.  (D.E. 136, ¶ 45; D.E. 167, ¶ 20; D.E. 175-1, p. 3).  During that hospitalization, Dr. Ramos did not give plaintiff any kind of steroids.  (D.E. 136 ¶ 51; D.E. 167, ¶ 26).  Instead, she gave prescribed her Pentasa and antibiotics, which are also used to treat ulcerative colitis.  (D.E. 136, ¶ 50; D.E. 167, ¶ 50).  When Dr. Ramos discharged Mercado from PCH on August 20, 2004, she did not prescribe her Prednisone or any other type of steroids. (D.E. 136, ¶ 52; D.E. 167, ¶ 27).

On September 11, 2004, Mercado returned to the emergency room at PCH.  (D.E. 136, ¶ 53; D.E. 140, ¶ 13; D.E. 167 ¶ 1; D.E. 169 ¶, 1).  The physician on call at the emergency room consulted with Dr. Ramos regarding plaintiff's treatment, and, subsequently, plaintiff had an argument with Dr. Ramos about the treatment that she had given her during the previous hospitalization.  (D.E. 136, ¶ 54; D.E. 167, ¶ 28).[6]  Plaintiff felt that she and Dr. Ramos did not get along and had poor communication.  (D.E. 167, ¶ 33; D.E. 167-5).  Plaintiff remained hospitalized for two days, during which she received intravenous Solumedrol, but not Prednisone.  (D.E. 136, ¶ 55; D.E. 167, ¶ 26; D.E. 167-7, 167-8).

Plaintiff was discharged on September 12, 2004.  D.E. 136, ¶ 55; D.E. 167, ¶ 26; D.E. 167-7, 167-8).  The discharge sheet completed by Dr. Ramos indicates that "due to concern for the side effects," plaintiff had not used the Pentasa and antibiotics that Dr. Ramos had prescribed her during the last admission because of plaintiff's reluctance to use steroids.  (D.E. 175-1, p. 19).  That record also shows that plaintiff had, on September 11, 2004, requested a dose of

---

[6] The parties dispute the nature of the argument: Mercado says that she was upset with Dr. Ramos because the previously prescribed medications did not improve her condition.  (D.E. 167, ¶ 28).  Dr. Ramos and PCH, on the other hand, say that plaintiff complained to Dr. Ramos that the medications she had previously prescribed (Pentasa and antibiotics) were very toxic and that she did not want to use them anymore because she was concerned about the side effects.  (D.E. 136, ¶ 54).

intravenous steroids, and that she was "now refusing use of antibiotics and is willing to use [steroids]."  Id.  Upon discharge, Dr. Ramos prescribed plaintiff 40 milligrams of Prednisone per day and advised her to see her gastroenterologist as soon as possible.  (D.E. 136, ¶¶ 55-59; D.E. 167, ¶¶ 26-33; D.E. 167-7, 167-8).  Plaintiff does not remember the duration of the prescription, but Dr. Ramos recalls that she prescribed it only for a short time—just enough to last plaintiff until she could see her gastroenterologist.  (D.E. 136-1, p. 37; D.E. 136-9, p. 12).  Dr. Ramos never saw plaintiff in her private office nor did she ever refer plaintiff to PCH.  (D.E. 167, ¶ 41; D.E. 175, ¶ 41).  Dr. Ramos never offered plaintiff 6MP or Embrel (D.E. 167, ¶¶ 45-48).

From September 16, 2004 until October 15, 2004, plaintiff was admitted at Hospital del Maestro in Puerto Rico.  (D.E. 136 ¶ 61; D.E. 167 ¶ 1).  She was given a prescription for Prednisone when discharged.  (D.E. 136 ¶ 62; D.E. 167 ¶ 1).  Subsequently, on October 21, 2004, she went to the gastric clinic of the Puerto Rico Medical Center.  (D.E. 136 ¶ 63; D.E. 167 ¶ 1).  At the time she went to the gastric clinic of the Puerto Rico Medical Center, she was taking 35-40 milligrams of Prednisone daily. Mercado visited the clinic again on November 4, 2004, at which time she was taking 35 milligrams of Prednisone.  (D.E. 136 ¶ 64; D.E. 167 ¶ 1).  Plaintiff was also taking Prednisone on March 31, 2005, when she went to HIMA San Pablo in Fajardo, with a chief complaint of chest pain.  (D.E. 136 ¶ 65; D.E. 167 ¶ 1).  Although plaintiff had previously been reluctant to use steroids and had complained about side effects from Prednisone, she testified at her deposition that it was not until 2005 that she began to learn about the drug and the side effects it caused by reading information from the internet.  (D.E. 167, ¶ 70; D.E. 175, ¶ 70).

From August 7, 2007 through August 10, 2007, plaintiff was admitted to the Stanford Hospital in California, due to bloody diarrhea and abdominal pain.  (D.E. 136 ¶ 66; D.E. 167 ¶ 1;

D.E. 136-11).  She was given a prescription for a low dose of prednisone with intent to taper, but she declined to take it as she said it made her "go crazy."  (D.E. 136, ¶ 67; D.E. 167, ¶ 35; D.E. 167-11).  Plaintiff was seen again at PCH on March 26, 2006, at which time the records indicate that she had taken steroids for a long period and had osteoporosis.  (D.E. 167, ¶ 39; D.E. 175, ¶ 39).

Plaintiff did not always buy and take Prednisone every time it was prescribed to her.  (D.E. 136 ¶ 40; D.E. 167 ¶ 1).  She does recall, however, that she bought the prescription on at least two occasions in California: once in the Marina del Rey Hospital and once in Cedars Sinai Medical Center in 2002 or 2003.  (D.E. 136 ¶ 36; D.E. 167 ¶ 1).  She also recalls buying Prednisone on three or four occasions in Puerto Rico.  (D.E. 136 ¶ 38; D.E. 167 ¶ 1).  Plaintiff is also aware that pharmacies give literature about medication when it is purchased.  (D.E. 136 ¶ 38; D.E. 167 ¶ 1).  However, and notwithstanding her reluctance to take steroids, antibiotics, or Pentasa when she was treated by Dr. Ramos at PCH, plaintiff stated at her deposition that "[i]f the doctor prescribes [a medication] to me I have to take it," and, for that reason, she never reads the accompanying literature.  (D.E. 136 ¶ 38; D.E. 167 ¶ 1; D.E. 136-1, p. 121),

Whenever plaintiff was prescribed Prednisone, it was usually in decreasing doses, such that she would start with a higher dose and eventually decrease the dosage.  (D.E. 167-2, p. 28).  Also, it was always prescribed for a limited time subsequent to a hospital admission.  (D.E. 167-2, p. 29, l. 14-16).  Plaintiff's deposition testimony varied, however, as to how long Prednisone was usually prescribed to her.  She initially stated that upon release from the hospital, it was usually prescribed for two or three weeks.  (D.E. 167-2, p. 31; cited by defendants at D.E. 136 ¶ 39).  However, during the same deposition, she later testified that it was sometimes prescribed

for longer periods of time, specifically, two or three months.  (D.E. 167-2, p. 28, l. 24; cited by

plaintiff at D.E. 167 ¶ 18).

## II.   LEGAL STANDARDS

### A.   Summary Judgment Under Rule 56(c)

The purpose of summary judgment "is to pierce the boilerplate of the pleadings and assay

the parties' proof in order to determine whether trial is actually required."  Wynne v. Tufts Univ.

Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992).  Summary judgment is granted when the record

shows that "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a).[7]  "A dispute is genuine if the evidence about

the fact is such that a reasonable jury could resolve the point in the favor of the non-moving

party.  A fact is material if it has the potential of determining the outcome of the litigation.'"

Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quoting Rodríguez-Rivera v.

Federico Trilla Reg'l Hosp., 532 F.3d 28, 30 (1st Cir. 2008)).

The party moving for summary judgment bears the burden of showing the absence of a

genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the

movant presents a properly focused motion "averring an absence of evidence to support the

nonmoving party's case[,]' [t]he burden then shifts to the nonmovant to establish the existence of

at least one fact issue which is both 'genuine' and 'material.'"  Griggs-Ryan v. Smith, 904 F.2d

112, 115 (1st Cir. 1990) (quoting Garside v. Osco Drug., Inc., 895 F.2d 46, 48 (1st Cir. 1990).

For issues where the nonmoving party bears the ultimate burden of proof, that party cannot

---

[7] Rule 56 was amended effective December 1, 2010, after the present suit was filed.  However, "[t]he substantive standard for summary judgment remains unchanged."  Tropigas De P.R. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 n.5 (1st Cir. 2011).  Therefore, since the application of the amended rule to the present case would be "feasible" and would not work an "injustice," Rule 56, as amended, shall govern the determination of the parties' motions.  Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 777 n.4 (1st Cir. 2011) (citing 28 U.S.C. § 2074(a)).

merely "rely on the absence of competent evidence, but must affirmatively point to specific facts" in the record "that demonstrate the existence of an authentic dispute."   McCarthy 56 F.3d at 315.   The plaintiff need not, however, "rely on *uncontradicted* evidence . . . .   So long as the plaintiff's evidence is both cognizable and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to determine which version of the facts is most compelling." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004) (emphasis in original).

In assessing a motion for summary judgment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."   Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990) (citations omitted).   There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood . . . ."   Greenburg v. P. R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987).   The court may, however, safely ignore "conclusory allegations, improbable inferences, and unsupported speculation."   Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).   Moreover, "[e]vidence that would be inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment."   Vázquez v. López-Rosario, 134 F.3d 28, 33 (1st Cir. 1998).   Similarly, any affidavits or declarations submitted to in support of or to oppose the motion "must be made on personal knowledge [and] set out facts that would be admissible in evidence . . . ."   Fed R. Civ. P. 56(c)(4).

### B.      Plaintiff's Legal Theory: Informed Consent

Plaintiff sues Dr. Ramos and the Hospital under a failure to obtain informed consent theory.   She alleges that Dr. Ramos, as well as the other defendant physicians, Drs. González and

Pérez, failed to fully inform her about the "risk of Prednisone treatment, its benefits, available alternatives, [or] the probable risks of not receiving the treatment." (D.E. 107, p. 7, ¶ 20). She argues that if she had been properly informed, she would not have consented to be treated with Prednisone and that, as a result of said treatment, she has suffered injuries, including osteoporosis, loss of sight, pain in her extremities, premature menopause, glucose intolerance, weight gain, facial and knee swelling, blurry vision, and pain in her hips, shoulders, wrists, and other parts of her body. (D.E. 107, p. 10 ¶¶ 26, 29).

As with all diversity cases, Puerto Rico law supplies the substantive legal standards here. Erie R.R. v. Tompkins, 304 U.S. 64, 68 (1938); Daniels Recio v. Hosp. del Maestro, 109 F.3d 88, 90 (1st Cir. 1997). The basic standard is Section 1802 of the Puerto Rico Civil Code, which states that "[a] person who by act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." P.R. Laws. Ann. tit. 31 § 5141 (2009). A claim under this provision is comprised of the three elements common to all negligence tort claims: (1) evidence of injury, (2) a negligent act or omission (breach of a duty), and (3) "a sufficient causal nexus between the injury and negligent act or omission (proximate cause)." Vázquez Filippetti v. Banco Popular de Puerto Rico, 504 F.3d 43, 49 (1st Cir. 2007) (citing Torres v. Kmart Corp., 233 F. Supp. 2d 273, 277-78 (D.P.R. 2002)). For medical malpractice claims specifically, a plaintiff must prove: (1) the duty owed, which is the minimum standard of professional "knowledge and skill required under the relevant circumstances," (2) an act or omission that fell short of that standard, and (3) a sufficient causal nexus between that act or omission and the alleged harm. Cortés Irizarry v. Corporación Insular de Seguros, 111 F.3d 184, 189 (1st Cir. 1997). The causal nexus is sufficient if it is proven that the defendant's breach

was "the factor that in all probability caused the harm to the patient." <u>Santiago Otero v. Méndez,</u> <u>et. al.</u>, 135 D.P.R. 540, 1994 P.R. Offic. Trans. 909, 224 (1994) (citations omitted).

Where a plaintiff sues based on informed consent, the breach alleged is the physician's failure to inform her of the possible risks, consequences, and alternatives to a given procedure or course of treatment.  As such, an informed consent action is "independent and distinguished from a cause of action for medical malpractice as to the elements of 'error of judgment regarding diagnosis and/or treatment.'" <u>Santiago v. Hospital Cayetano Coll y Toste</u>, 260 F. Supp. 2d 373, 383-86 (D.P.R. 2003) (quoting <u>Santiago Otero</u>, 135 D.P.R. at 557).  That is to say, the plaintiff need not prove that the defendant doctors acted below the relevant standard of care in prescribing the given treatment.  Rather, she need only show that the doctor failed to provide her with certain information that the doctor was under a duty to disclose.  The plaintiff must also prove that this breach was the proximate cause of her injuries.  <u>Rodríguez Crespo v. Hernández</u>, 121 D.P.R. 639, 665 (1988).  Accordingly, the three elements on a malpractice suit for failure to obtain informed consent are: (1) that the doctor had a "duty to divulge specific information," (2) that the specific information was not disclosed, and (3) that the proximate cause of the alleged harm was the lack of disclosure of the risks that the treatment involved.  <u>Santiago Otero</u>, 135 D.P.R. at 558 n.25 (citing G.F. Tietez, <u>Informed Consent in the Prescription Drug Context: The Special Case</u>, 61 WASH. L. REV. 367, 371 (1986))

In <u>Sepúlveda Arrieta v. Méndez</u>, 137 D.P.R. 735 (1994), the Puerto Rico Supreme Court spoke at length about the scope of physicians' duty to inform, as well as the nature of the proximate cause element.  With respect to the scope of the disclosure that is required, the Court noted that United States jurisdictions were almost equally divided between two different approaches: one that uses the prevailing standard in the medical community and one that uses the

14

standard of the reasonable patient.  The first standard, which the Court adopted, looks at whether "a reasonable medical practitioner, conforming to current medical standards, and in similar situations, would have divulged the information," and generally requires the plaintiff to present expert testimony.  Id. at 743.  The Court also discussed the approach in several European jurisdictions, which involves more of a case by case analysis, and concluded that the general rule it had adopted "should be modified in each case according to the degree of information of the patient and the specific treatment that the physician proposes."  Id. at 750-51.  For example, the scope of the required disclosure varies inversely to the urgency and importance of the given medical procedure.  Id. at 749.  Additionally, a physician is not liable for informing about risks that are not reasonably foreseeable, or that an average patient would be aware of, or that the particular patient knows of because of a similar treatment in the past.  Id. at 751 (citing Rodríguez Crespo v. Hernández, 121 D.P.R. 639, 21 P.R. Offic. Trans. 637 (1988) ("[T]he physician should disclose information that he *reasonably* believes or should know might pose a risk.") (emphasis in original)).

With respect to proximate cause, the Puerto Rico Supreme Court noted that most United States jurisdictions look at whether "the lack of information must have been a determinant factor in the patient's decision to consent to the medical procedure."  Id. at 755.  Following the civil law tradition, however, Puerto Rico analyzes proximate cause "not from the standpoint of what the patient might have done if he would have had additional information, but from what the physician can be required to foresee as a normal consequence of his omission."  Id. 758-59.  Accordingly, in the present case, the question is whether the defendant doctors "had to foresee that the lack of information would lead the patient to expose herself to the nondisclosed risks."

Id. at 760.  Of course, plaintiff must also prove the actual causation element: that she "suffered a

harm as a consequence of" the treatment in question.  See Santiago Otero, 135 D.P.R. at 558.

III.  ANALYSIS

A.  Vicarious Liability of the Hospital

The defendant hospital argues that it cannot be held responsible for the doctors' alleged

malpractice because a cause of action for failure to obtain informed consent lies only against the

doctor, not the hospital.  In support of this claim, PCH cites only one case: Santiago Otero v.

Méndez, 135 D.P.R. 540, 1994 P.R. Offic. Trans. 909, 224 (1994).  Nothing in this case,

however, supports the hospital's argument.  Santiago Otero solely addresses the defendant

doctor's liability for failure to obtain informed consent; it does not discuss the liability of the

hospital where the alleged malpractice was committed.  See id.[8]

The leading case on this issue is Márquez Vega v. Martínez Rosado, 116 D.P.R. 397, 16

P.R. Offic. Trans. 487 (1985).  See Recio v. Hospital del Maestro, 882 F. Supp. 200, 224-25

(D.P.R. 1995).  In that case, the Puerto Rico Supreme Court began by clarifying that hospitals

owe an independent duty of care to their patients and may also be held vicariously liable for the

actions of employee physicians.  Márquez Vega, 116 D.P.R. at 406.[9]  When the physician in

question, however, is not an employee, the liability of the hospital depends on whether the

patient entrusted her health to the hospital or to the doctor.  Id.; Recio, 882 F. Supp. at 224.

When a patient "goes directly to the hospital seeking medical aid and the hospital 'provides' a

doctor," then the patient has entrusted her health to the hospital and the latter is thus "jointly and

---

[8] It is not even evident that the hospital was a party in Santiago Otero.

[9] Specifically, hospitals have an independent duty to, inter alia, "(a) carefully select the physicians to whom it grants privileges; (b) require that such physicians stay abreast of the most recent developments in their respective fields; [and] (c) monitor the work of such physicians, intervening, when possible, in the face of an obvious act of medical malpractice by one of them . . . ." Márquez Vega, 116 D.P.R. at 409-410.  In her complaint, plaintiff does not allege that the hospital breached its independent duty to her, but premises their liability only on their vicarious liability for the defendant doctors' actions.

severally liable for the negligent acts of said physician."   <u>Recio</u>, 882 F. Supp. at 225.   The opposite occurs when the patient has first gone directly to the doctor's private office and is then treated at the hospital "on the physician's recommendation merely because said institution is one of several which the physician has the privilege is using." <u>Márquez Vega</u>, 116 D.P.R. at 409.  In the latter situation, the patient has primarily entrusted her care to the doctor, and thus the hospital will not be vicariously liable for the doctor's negligent acts—it would only be liable for a breach of its independent duty to the patient.  <u>Id.</u>

The defendant hospital has set forth no facts showing that plaintiff primarily entrusted her care to Dr. Ramos or Dr. González rather than to the hospital.  As an initial matter, there are no proffered facts regarding the hospital's employment relationship with Dr. González or Dr. Ramos, and it thus cannot be deemed undisputed that they are not employees of PCH. Further, even if it were clear that Drs. Ramos and González are not PCH employees, the evidence of record tends to show that plaintiff primarily entrusted her care to PCH.  Plaintiff's four hospitalizations at PCH were emergency room visits and there is no indication that plaintiff had ever seen either of the doctors prior to these visits.  Dr. González testified that he treated plaintiff only because he was on call that day.  Dr. Ramos testified that she had never seen plaintiff in her private office.  Therefore, PCH has failed to proffer any evidence showing that plaintiff entrusted her health primarily to the doctors.

The hospital seems to suggest that the doctrine of vicarious liability functions differently for informed consent claims, but it does not cite any precedent that supports this contention. Nothing in <u>Márquez Vega</u> or its progeny support this proposition either.  Moreover, courts in Puerto Rico addressing informed consent claims where the hospital is a defendant have not treated the hospital differently with respect to vicarious liability, <u>see, e.g.</u>, <u>Santana Concepción v.</u>

Centro Médico del Turabo, Case No. 08-1262 (SEC), 2012 WL 1107663 (D.P.R. Mar. 30, 2012), and the court sees no reason for doing so.  Accordingly, the hospital's motion should not be granted on these grounds.

**B.      Dr. Ramos's Causation Argument**

Dr. Ramos's first argument is that she cannot be held liable for any injuries that plaintiff may have sustained from using Prednisone because there is no evidence that plaintiff ever filled the only Prednisone prescription that Dr. Ramos gave her.  To support this argument, Dr. Ramos claims that she subpoenaed plaintiff's prescription records from every pharmacy in Puerto Rico where plaintiff bought prescription drugs during the relevant time period and that none of them reflect that she filled a prescription for Prednisone.  However, the defendant doctor's own evidentiary submissions fail to support this proposition.  As part of her required discovery disclosures, plaintiff gave defendants a list of all pharmacies in Puerto Rico where she (or her father, on her behalf) bought prescription drugs.  (D.E. 139-3).  That list includes the following pharmacies: "the pharmacy inside Ashford Presbyterian," Luquillo Mar Pharmacy, Walmart Pharmacy in Fajardo, Pueblo Supermarket Pharmacy in Fajardo, Walgreens in Condado, Walgreens in Luquillo, and a "pharmacy in the town of Luquillo."  Id.  To support her motion, however, Dr. Ramos submitted records subpoenaed from only the following pharmacies: Farmacia Brisas de Mar in Luquillo, Farmacia Marena in Luquillo, Farmacia Profesional Ashford, Walmart Pharmacy in Fajardo, Pueblo Pharmacy in Fajardo, and Walgreens (covering all Puerto Rico stores).  (D.E. 125-1; D.E. 128-1).  None of these records show that plaintiff filled a prescription for Prednisone; however, they are incomplete .

First of all, plaintiff's disclosures identified an unnamed pharmacy in the town of Luquillo, and it is not clear from defendant's evidentiary proffer that records were obtained from

all pharmacies in Luquillo.[10]   Additionally, Dr. Ramos has not presented any records from what plaintiff identified as "the pharmacy inside Ashford Presbyterian," which the court concludes is the pharmacy inside of PCH, the defendant hospital.[11]   Dr. Ramos has not provided any explanation for her failure to submit pharmacy records from her co-defendant, PCH.  Nor has Dr. Ramos indicated that "Farmacia Profesional Ashford" is the same as the "pharmacy inside of Ashford Presbyterian." Although the records that were submitted do not show that plaintiff purchased Prednisone, the court cannot be assured that Dr. Ramos obtained all of plaintiff's prescription records.   Therefore, Dr. Ramos's evidentiary proffer does not clearly show an absence of a genuine dispute over whether plaintiff filled the Prednisone prescription from Dr. Ramos, and summary judgment should thus be denied on this point.[12]

### C.      PCH's Causation Argument

In its memorandum of law, defendant PCH argues that it cannot be the actual cause of plaintiff's alleged injuries because it is uncontested that its doctors prescribed her Prednisone for a limited time on only three occasions, whereas doctors at other hospitals prescribed her Prednisone on many other occasions for longer periods of time.   (D.E. 137, pp. 14-23). Therefore, the hospital contends, it is "completely improbable" that the doses provided by the PCH doctors caused plaintiff's alleged injuries and concludes that plaintiff "has failed to

---

[10] In plaintiff's deposition, she stated that she had used a pharmacy in the town of Luquillo, but that she could not recall the name.  (D.E. 167-2, p. 170, l. 21-22).  She also stated that she did not remember where she filled the prescription that Dr. Ramos gave her, but that she believes she sent her father to pick it up for her.  (D.E. 167-20). Althouth Dr. Ramos did obtain records from Farmacia Brisas del Mar and Farmacia Marena, both in Luquillo, and Walgreens pharmacies (covering all of Puerto Rico), there is no certification or proposed fact that these are indeed the only pharmacies that existed and operated in Luquillo at the time of the events at issue.

[11] Although the hospital is identified as "Presbyterian Community Hospital" in all pleadings in this case, the medical records in the summary judgment records bear the name "Ashford Presbyterian Community Hospital."  (See, e.g., D.E. 167-3).

[12] Had Dr. Ramos in fact shown that plaintiff never bought the Prednisone that she prescribed for her, then the undersigned's recommendation for summary judgment purposes might be different.  However, due to the absence of any records from the PCH pharmacy, and because the undersigned cannot take judicial notice that Farmacia Brisas del Mar, Farmacia Marena, and Walgreens encompass all the pharmacies in Luquillo, it is not clear that plaintiff never filled the prescription.

establish the causal link between" the doctors' actions and her injuries.  (D.E. 137, p. 22).  PCH does not properly include this contention in its separate statement of proposed uncontested facts and it submits no expert evidence to support it.  Accordingly, the hospital's argument fails both as a matter of form and substance.

PCH misapprehends its burden as the movant for summary judgment.  At trial, of course, plaintiff would have the burden to establish that the Prednisone prescribed by the PCH doctors was "the factor that in all probability caused [her] harm."  Santiago Otero, 135 D.P.R. 540.  At summary judgment, however, the movant bears the initial burden to show "an absence of evidence to support the nonmoving party's case."  Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex, 477 U.S. at 325).  Only then does the burden shift "to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'"  Id. (citations and quotations omitted).  The movant may carry this initial burden either by submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or by "demonstrat[ing] to the court that the nonmoving party's evidence is insufficient to establish an essential element of its claim."  Oriental Financial Group v. Fed. Ins. Co., 309 F. Supp. 2d 216, 218 (D.P.R. 2004).  Here, PCH has done neither of these things.  All factual contentions at summary judgment must be clearly set forth in a separate statement of numbered paragraphs.  See Local Rule 56; Mariani Colón v. Dep't of Homeland Sec. ex rel. Chertoff, 511 F.3d 216, 219 (1st Cir. 2007) (noting that the purpose of the rule is to prevent the parties from "improperly shift[ing] the burden of organizing the evidence presented in a given case to the district court.").  The hospital's separate statement of proposed facts contains no citation to an expert report indicating that the use of Prednisone in the quantities prescribed by its physicians is harmless (or does not cause the alleged harm) in a patient with plaintiff's medical

history.  (See D.E. 136).  It is well-established that expert testimony is generally required in medical malpractice cases to prove whether a given defendant's actions caused the plaintiff's alleged injuries.  See Pagés Ramírez v. Ramírez González, 605 F.3d 109, 113 (1st Cir. 2010) ("[I]n a medical malpractice action . . . to make a judgment on causation, a trier of fact will generally need the assistance of expert testimony."); Martínez Serrano v. Quality Health Svcs. Of P.R., Inc., 568 F.3d 278, 286 (1st Cir. 2009); Rolón Alvarado v. Municipality of San Juan, 1 F.3d 74, 78 (1st Cir. 1993).  This case does not fall into the "narrow band of possible exceptions to the general rule requiring expert testimony" where "common knowledge and experience are all that is necessary to comprehend a defendant's negligence."  Martínez Serrano, 568 F.3d at 286 (citing Rolón Alvarado, 1 F.3d at 79).  The average layperson does not know how much Prednisone must be consumed for an individual to suffer long-term consequences.  To the contrary, determining when or if a given medication caused injuries when it was prescribed is the typical "complex medical and scientific issue[ ] that [is] prevalent in medical malpractice cases" and requires the assistance of a medical or scientific expert.  See Rojas Ithier v. Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R., 394 F.3d 40, 43 (1st Cir. 2005).  The facts may indeed raise doubts as to whether the PCH doctors caused plaintiff's alleged injuries, considering that they prescribed her Prednisone on only three occasions following emergency room visits, whereas plaintiff's doctors in California gave her Prednisone many times as part of a long-term treatment plan.  Nevertheless, mere doubt is an insufficient basis for granting summary judgment, as is PCH's conjecture that is unsupported by a citation to any expert evidence.

Further, even overlooking this error, the assertions in PCH's memorandum of law are insufficient.  The hospital has not affirmatively stated that plaintiff lacks the evidence to show

that the PCH doctors caused her alleged injuries. [13]   Accordingly, it is recommended that the court decline to grant PHC summary judgment on these grounds.

### D.        Whether the Doctors Breached their Duty to Obtain Plaintiff's Informed Consent

PCH's final argument is that both Drs. González and Ramos in fact did fulfill their duty to obtain plaintiff's informed consent before administering and prescribing her Prednisone. Dr. Ramos makes the same argument as to herself only.   First, both defendants argue that the doctors were not required to inform plaintiff about the side effects of Prednisone because plaintiff had taken Prednisone previously, and it was therefore reasonable for the doctors to assume that she was already aware of its side effects.   Second, defendants argue that Dr. Ramos did in fact discuss the side effects of Prednisone with plaintiff before she prescribed it to her. Each of these arguments will be addressed in turn.

Generally, expert testimony should be taken to determine the scope of the disclosure that a physician must make in order to conform to the prevailing medical standard in the community and thereby obtain the patient's informed consent.  See Sepúlveda de Arrieta, 137 D.P.R. at 743. Here, defendants have not presented any expert testimony regarding the standard of care and setting forth the information that a reasonable medical practitioner would have disclosed in this situation.  However, applying the principles that the Supreme Court of Puerto Rico has set forth regarding the scope of a doctor's duty to inform, some of the basic contours of the doctors' duty here can be discerned.  Specifically, doctors need not "disclose those risks than average patient would be aware of, or those risks that a particular patient knows about because of a similar treatment in the past."  Id. at 751.  Additionally, a doctor is permitted to make a less thorough

---

[13] Regardless of whether there is a report by plaintiff's expert in the summary judgment record which, due to its conclusory nature, may be insufficient to carry her burden to prove causation  (see infra, note 19; (D.E. 139-2; 167-21), in the absence of an affirmative statement in the proposed facts from either defendant on this point, the court cannot be assured that plaintiff possesses no other evidence of causation aside from this expert report.

disclosure when the treatment situation is more urgent and more necessary.  See id. at 749 ("If it is to save a life, the surgeon should, above all, create a favorable atmosphere.  If the intervention is simply useful, he must then be more precise in his disclosure.").  In light of these principles, it is clear that Drs. González and Ramos would not be required to discuss the side effects of Prednisone with plaintiff if they were aware that she had used the medication previously, especially an emergency situation, where their duty to disclose would have been reduced.

Defendants aver that, upon her first admission to PCH in December of 2002, plaintiff told Dr. González that she was taking Prednisone at that time and had been using that medication for "many years."  (D.E. 136, ¶¶ 14, 24 (citing Dr. González's deposition testimony)).  Plaintiff, in an unsworn statement under penalty of perjury submitted with her opposition to defendants' motion, states that she was not taking Prednisone at the time she was admitted to PCH and she never told Dr. González that she had been taking Prednisone for many years.  (D.E. 167, ¶¶ 5, 12).  However, plaintiff admits that, at some point, she did mention to Dr. González that she had used Prednisone before.  (D.E. 167-6, ¶¶ 2, 6).[14]  Additionally, it is undisputed that plaintiff recalls taking Prednisone at some point during the year 2002 and that she was taking Prednisone on November 12, 2002, just over a month before her December 29, 2002 admission to PCH.  (D.E. 167-2, p. 92, l. 11-19; D.E. 136-2).  Furthermore, it is uncontested that plaintiff, at some

---

[14] PCH argues that plaintiff cannot successfully contest this proposed fact by reference to her unsworn statement because it is a "self-serving statement . . . intended solely to create controversies of fact in order to defeat the PCH's motion for summary judgment."  (D.E. 175, p. 15, ¶ 45).  District courts are indeed "entitled to disregard portions of affidavits that include new information," when presented solely to oppose summary judgment.  Jiménez v. Island Oasis Frozen Cocktail Co., Inc., Civil No. 09-1748 (GAG), 2010 WL 3719216 at *4 (D.P.R. Sept. 14, 2010) (citing Hernández Loring v. Univ. Metropolitana, 233 F.3d 49, 54 (1st Cir. 2000).  However, this is so only when "said information is contradictory to previous testimony and was clearly asked for in previous questions."  Id.; see also Colantuoni v. Alfred Calcagni & Sons, 44 F.3d 1, 4-5 (1st Cir. 1994) ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony has changed.").  Here, defendants do not point to any conflicts between plaintiff's unsworn statement and her previous deposition testimony, excerpts of which were submitted with their motion for summary judgment.  No conflict with her answers to interrogatories or requests for admissions has been brought to the attention of the court either.  Therefore, plaintiff's unsworn statement may properly be considered as evidence.

point, told Dr. González that she had taken Prednisone before, and that the doctor noted in plaintiff's medical record on the day that she was first admitted to PCH that her condition had been treated with Prednisone previously.  (D.E. 167-6, p. 2, ¶ 6; D.E. 175-1, p.12).  Therefore, the uncontested facts show that Dr. González knew that plaintiff had previously used Prednisone when he prescribed it to her and when he administered it during her hospital stay.  Additionally, the second time that Dr. González treated plaintiff, it was plaintiff's own gastroenterologist who recommended that Dr. González give her Prednisone.  Moreover, both times that Dr. González treated plaintiff were emergency room admissions—acute, urgent situations in which his duty of disclosure was reduced.  Therefore, Dr. González did not have a duty to discuss Prednisone's potential side effects and potential alternatives.[15]  Accordingly, PCH cannot be held liable to plaintiff based on based on Dr. González's conduct.[16]

With respect to Dr. Ramos, however, the undisputed facts do not clearly show that she knew that plaintiff had previously used Prednisone.  In her deposition, Dr. Ramos stated that plaintiff told her that she had used Prednisone before on various occasions but that she did not constantly use it because she was concerned about the side effects.  (D.E. 136, ¶ 47; D.E. 140, ¶ 7; D.E. 136-9, p. 44).  In her declaration, however, plaintiff stated that she never specifically told Dr. Ramos that she had used Prednisone and was concerned about its side effects.  (D.E. 167, ¶ 22; D.E. 167-6, ¶ 8).[17]  Although it is undisputed that Dr. Ramos noted in plaintiff's medical

---

[15] Although PCH frames this argument in terms of duty and breach, it can also be viewed from a proximate cause angle.  To establish proximate cause, plaintiff must show that the defendant doctors "had to foresee that the lack of information [about Prednisone] would lead [plaintiff] to expose herself to the nondisclosed risks."  Sepúlveda de Arrieta, 137 D.P.R. at 760.  Because Dr. González knew that plaintiff had previously used Prednisone, he could reasonably assume that she was already aware of the drug's side effects and thus it was not the lack of information about them that would lead her to expose herself to those risks.  Especially considering that this was an emergency situation, it would be reasonable for Dr. González to assume that plaintiff was willing to expose herself the risk of side effects in order to control an acute episode of bloody diarrhea and severe abdominal pain.

[16] Dr. González himself has not moved for summary judgment.

[17] Defendants, once again, point to the fact that plaintiff's declaration was executed after the motion for summary judgment was filed and argue that it is self-serving.  They have not, however, pointed to any conflict with plaintiff's

records that plaintiff was reluctant to use steroids (D.E. 175-1, p. 3), this does not necessarily mean that plaintiff told Dr. Ramos that she had, in fact, used steroids previously. Therefore, it remains disputed whether plaintiff told Dr. Ramos that she had used Prednisone before. Additionally, defendants point to no record evidence showing that Dr. Ramos became aware of plaintiff's prior Prednisone use via other sources, for example, access to the medical records from plaintiff's treatment with Dr. González. The undisputed facts could certainly give rise to a reasonable inference that Dr. Ramos was aware of plaintiff's prior Prednisone use, considering her reluctance to use steroids, her subsequent refusal of antibiotics and willingness to use steroids, and her request for a dosage of Solumedrol (the intravenous analogue of Prednisone). However, these facts to do not compel such an inference, and a jury could reach a different conclusion. Accordingly, defendants have not shown that Dr. Ramos had no duty to inform plaintiff about the side effects of Prednisone based on her prior usage of that drug.

Defendants further argue that Dr. Ramos did, in fact, inform plaintiff about Prednisone's side effects; however, a dispute exists as to this fact as well. Once again, Dr. Ramos testified at her deposition that she discussed the side effects of Prednisone with plaintiff, including weight gain, swelling, increase in blood sugar levels, and increase in blood pressure. (D.E. 136, ¶ 49; D.E. 136-9, pp. 22-24). Plaintiff contends in her declaration that Dr. Ramos never discussed these side effects with her. (D.E. 167-6, ¶ 10). Defendants have not pointed to any deposition testimony from plaintiff that contradicts her statement. Accordingly, this is a factual dispute that should be decided by a jury. See Pagés Ramírez v. Hosp. Español Auxilio Mutuo de Puerto Rico, Inc., 547 F. Supp. 2d 141, 153 (D.P.R. 2008) (citing Cortés Irizarry, 111 F.3d at 189) (issues of deviations from the medical standard of care are questions of fact that, where

---

deposition testimony regarding the question of whether plaintiff told Dr. Ramos about her previous use of Prednisone. See supra, note 14. No conflict with plaintiff's answers to interrogatories or requests for admissions has been brought to the attention of the court either.

genuinely disputed, must be decided by a jury).  Moreover, even if Dr. Ramos's deposition testimony were undisputed, it does not establish that she informed plaintiff of other, long-term side effects that plaintiff claims can result from Prednisone use, such as osteoporosis.[18]  It is not clear from the summary judgment record whether Dr. Ramos's duty to disclose would have encompassed such long-term risks, as there is no expert testimony that definitively establishes the standard of care for this particular situation.[19]  Accordingly, it remains disputed whether Dr. Ramos fulfilled her obligation to obtain plaintiff's informed consent before prescribing her Prednisone, and it is thus recommended that both defendants' motions for summary judgment be denied.

## IV.   CONCLUSION

Based on the foregoing analysis of defendants' motions, it is hereby recommended that defendant Presbyterian Community Hospital's motion for summary judgment (D.E. 137) and defendant Dr. Wanda Ramos Vélez's motion for summary judgment (D.E. 139) be DENIED.

The parties have fourteen (14) business days to file any objections to this report and recommendation.  Failure to file same within the specified time waives the right to appeal this

---

[18] The pending motions for summary judgment do not assert in their respective statements of proposed facts that plaintiff has not suffered any damages as a result of her use of Prednisone.  Instead, said motions argue that the Prednisone prescribed by Dr. González and Dr. Ramos could not have been the cause of plaintiff's injuries, an argument that is unavailing for the reasons previously mentioned.  (See Section III )(C)).  Therefore, there is no need to address the evidence on the record of plaintiff's injuries, which she alleges to be "osteoporosis, loss of sight, pain in her extremities, premature menopause, glucose intolerance, weight gain, swelling of the knees and face, blurry vision and constant pain in her hips, shoulders, wrists, and other parts of her body." (D.E. 107 at ¶29).

[19] The only expert testimony in the summary judgment record is a one-page report from plaintiff's expert.  (D.E. 139-2; 167-21).  However, because defendants proposed no facts relating to the standard of care or actual causation of plaintiff's injuries, this report was not used to support or deny any of defendants' proposed facts.  The report was used only in plaintiff's additional statement of proposed facts (D.E. 167, p. 15-17, ¶¶ 37-38); however, instead of proposing a fact and citing to the report, plaintiff simply copied several paragraphs from the report directly into her statement of additional proposed facts, needlessly complicating the task of determining exactly what facts plaintiff wishes to propose.  Moreover, if plaintiff's intention was to establish the standard of care for summary judgment purposes, such attempt has failed.  With respect to said standard, the report contains only one sentence listing the "specific risks the patient should have been informed of." (D.E. 167-21).  It does not explain the basis for this conclusion, nor does it discuss the prevailing standard in the medical community or any factors relevant to a doctor's duty to disclose, such as the urgency of the treatment and the likelihood of a given risk materializing.  As such, the statement is conclusory and does not establish the standard of care in this case.

report and recommendation.   Fed.R.Civ.P. 72(b)(2); Fed.R.Civ.P. 6(c)(1)(B), and Local Rule 72(d); see also 28 U.S.C. § 636(b)(1); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4 (1st Cir. 1986).

IT IS SO RECOMMENDED.

In San Juan, Puerto Rico, this 16th day of June, 2012.

s/Marcos E. López
U.S. Magistrate Judge