IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| CARMEN MERCADO-VELILLA,<br><br>**Plaintiff,**<br><br>v.<br><br>ASOCIACION HOSPITAL DEL MAESTRO, *et al.*,<br><br>**Defendants.** | **CIVIL NO.** 08-1275 (JAG) |

**OPINION & ORDER**

This is a medical malpractice action filed by Carmen Mercado-Velilla against Asociación Hospital del Maestro, Inc., Presbyterian Community Hospital, Dr. Carlos González Fuentes, Dr. Wanda Ramos Vélez, and Dr. José Pérez López, as well as the doctors' spouses and conjugal partnerships and various insurance companies.[1] In short, Plaintiff claims she suffered damages as a result of her doctors' failure to obtain her informed consent prior to treating her ulcerative colitis with Prednisone, a steroidal medication.

Pending before the Court are two motions for summary judgment, one filed by PCH, and the other by Dr. Ramos and her insurer Triple-S Propiedad. (Docket Nos. 137, 139). After these were fully briefed, they were referred to a U.S. Magistrate

---

[1] In keeping with the Magistrate Judge's naming convention, the Court will refer to Mercado-Velilla as "Plaintiff," and the Presbyterian Community Hospital as "PCH."

Judge for a Report and Recommendation. (Docket No. 159). The Magistrate Judge then issued an omnibus Report addressing both motions, and recommending they be denied. (Docket No. 194). Only PCH chose to file objections to the Magistrate's Report. (Docket No. 195).[2]

## BACKGROUND[3]

The majority of the parties' proposed facts are common to both motions and will therefore be summarized jointly, unless otherwise indicated.[4] After applying Local Rule 56, the facts of the case for purposes of these motions are set forth below.[5]

---

[2] The Magistrate Judge dismissed Plaintiff's complaint against Dr. Gonzalez because, as will be discussed in further detail below, Plaintiff failed to prove her informed consent theory against Dr. Gonzalez. Instead of filing a direct objection to this determination, Plaintiff limited herself to filing a motion in opposition to PCH's objections. (Docket No. 196). That motion is confusing and merely appears to rehash the arguments made in the briefs before the Magistrate Judge. Even ignoring the motion's title and assuming Plaintiff had intended to object to the Magistrate Judge's determination on Dr. Gonzalez's liability, Plaintiff has failed to follow the clear instruction of Local Rule 72(d) which requires Plaintiff to make written objections specifically identifying "the portions of the proposed findings and recommendations to which objection is made and the basis for the objection." Local Rule 72(d). At most, Plaintiff's objections are subsumed within her arguments in opposition to PCH's motion. The Court will not task itself with extracting any opposition therefrom.

[3] This section is taken directly from the Report.

[4] Dr. Ramos's paragraphs of proposed facts are numbered 1-21 (D.E. 140) and the hospital's proposed facts are numbered 1-68 (D.E. 136). Both defendants' proposed facts numbered 1-3 are identical. Dr. Ramos's proposed facts numbered 4-20 are identical to the hospital's proposed facts numbered 44-60, and

Plaintiff was diagnosed with colitis in 1998 and, at some time between 1999 and 2000, she was diagnosed with ulcerative colitis at a hospital in New York City. (D.E. 136, ¶¶ 1, 2; D.E. 140, ¶¶ 1, 2; D.E. 167, ¶ 1, D.E. 169, ¶ 1). Her condition caused her to suffer constant stomach pain and frequent bloody diarrhea. (D.E. 136, ¶ 3; D.E. 140, ¶ 3; D.E. 167, ¶ 1; D.E. 169, ¶ 1). Plaintiff does not remember if the physicians who diagnosed her in New York City gave her Prednisone. (D.E. 136, ¶ 4; D.E., 167 ¶ 1).

---

Dr. Ramos's proposed fact number 21 is the same as the hospital's proposed fact number 68. Plaintiff's responses in opposition to both sets of common facts are also identical.

[5] Local Rule 56 "structures the presentation of proof at summary judgment." Goya Foods, Inc. v. Orion Distributors, Inc., Civil No. Civil No. 10-1168 (BJM), 2012 WL 1069191, at * 1 (D.P.R. Mar. 29, 2012). It "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," CMI Capital Market Inv. v. González Toro, 520 F.3d 58, 63 (1st Cir. 2008), by requiring "a party opposing a motion for summary judgment to accept, deny, or qualify each entry in the movant's statement of material facts paragraph by paragraph and to support any denials, qualifications, or new assertions by particularized citations to the record." Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 6-7 (1st Cir. 2007). In accordance with Local Rule 56(e), all proposed facts that are properly supported by record evidence and have not been successfully controverted or qualified by the opposing party have been deemed admitted. Likewise, the court has disregarded any proposed facts that are not supported by the cited record evidence. See Local Rule 56(e) (requiring all facts to be supported by a specific record citation). Additionally, there are certain points that neither party has represented accurately in their opposing statements of proposed facts. In those instances, the court has derived the correct reflection of the fact in question directly from the summary judgment record.

At some point in 2001, plaintiff was hospitalized at Daniel Freeman Marina Hospital in Marina del Rey, California, for eight to ten days. (D.E. 136 ¶ 6; D.E. 167 ¶ 1). There, she was given Prednisone to treat her ulcerative colitis. (D.E. 136 ¶¶ 5, 6; D.E. 167 ¶ 1). The physician who prescribed the Prednisone did not tell plaintiff anything about the medication, nor did anyone else at the Daniel Freeman Hospital inform her of Prednisone's possible side effects. (D.E. 136 ¶ 7; D.E. 167 ¶ 1). Upon discharge from Daniel Freeman Hospital, Mercado was given a prescription of Prednisone to use for 2 to 3 weeks. (D.E. 136 ¶ 8; D.E. 167 ¶ 1).

During the year 2002, plaintiff took Prednisone for a brief time period and she stopped because she was exploring alternative and holistic treatments. (D.E. 136 ¶ 11; D.E. 167 ¶ 3; D.E. 167-2, p. 91, l. 11-19). The record does not indicate during the exact time period in 2002 during which plaintiff was taking Prednisone. However, on November 12, 2002, when plaintiff visited Saint John's Hospital in Santa Monica, California, she was taking Prednisone daily. D.E. 136 ¶ 10; D.E. 167 ¶ 3; D.E. 136-2). Plaintiff was admitted to Saint John's hospital principally because of an anal fissure that she had developed, but she was also treated there for her ulcerative colitis. (D.E. 136 ¶ 9; D.E. 167 ¶ 2, D.E. 167-2, p. 4, l. 1-5).

On December 29, 2002, plaintiff went to the emergency room of the defendant hospital, PCH, with symptoms of strong abdominal pain, bloody diarrhea and nausea. (D.E. 136 ¶ 12; D.E. 167 ¶ 1). Plaintiff remained at PCH through December 31, 2002. In the emergency room, she was evaluated by co-defendant Dr. Carlos R. González Fuentes ("Dr. González"), an internal medicine specialist. (D.E. 136 ¶ 13; D.E. 167 ¶ 1). Dr. González treated plaintiff because he was in the roster of the PCH emergency room and was on call at that time. (D.E. 167, ¶¶ 51-52; D.E. 175, ¶ 51-52). In a consultation report dated December 29, 2002, Dr. González noted that plaintiff was treating her condition with Asacol and Prednisone. (D.E. 175-1, p. 12).

During her hospitalization, Dr. González ordered that plaintiff be given Solumedrol intravenously, but he did not administer Prednisone. (D.E. 136 ¶ 15, D.E. 167 ¶ 6).[6] On December 31, plaintiff still had mild diarrhea, but she asked to be discharged because she wanted to be home that day. (D.E. 136 ¶ 16; D.E. 167 ¶ 7; D.E. 175-1, p. 14). Upon discharge, Dr. González testified at his deposition that he gave Mercado a prescription for Prednisone because he believed that if she did not take it, "a suprarenal catastrophe could occur." (D.E. 136

---

[6] Solumedrol is a steroid medication that has the same effect as Prednisone, but is taken intravenously rather than orally. (D.E. 167 ¶ 50, D.E. 182-1, p. 3, l. 6-18).

¶ 17; D.E. 136-3 p. 45-46; D.E. 167 ¶ 8).[7] He advised her to see her gastroenterologist and continue her medication or to see if her gastroenterologist would consider a change in her medications. (D.E. 136 ¶ 18; D.E. 167 ¶ 1). He also told her to return to the hospital if her condition got worse. (D.E. 136 ¶ 17; D.E. 136-3 p. 45-46; D.E. 167 ¶ 8).

The next day, on January 1, 2003, Mercado returned to the PCH emergency room with complaints of rectal bleeding, diarrhea, nausea and abdominal pain. (D.E. 136 ¶ 20; D.E. 167 ¶ 1). Prior to her arrival, she was using Prednisone. (D.E. 136 ¶ 21; D.E. 167 ¶ 1). During that hospitalization, Dr. González treated plaintiff with Solumedrol until January 8, 2003, at which point he switched her to 40 milligram daily doses of Prednisone upon plaintiff's gastroenterologist's order. (D.E. 136 ¶ 22, D.E. 167 ¶ 10). Plaintiff remained at PCH until January 10, 2003. Upon discharge, Dr. González prescribed her 40 milligrams of Prednisone per day a medication called Pentasa, once again following the gastroenterologist's recommendation. (D.E. 136 ¶ 23; D.E. 167 ¶ 11).

---

[7] The doctor testified at his deposition that a patient who had been taking Prednisone for so many years should not have that medication discontinued because it could cause adrenal suppression or even death. (D.E. 136-3, p. 45-46). When asked whether he ordered plaintiff to use the Prednisone he prescribed he stated: "Of course. Otherwise, I'd kill her." (D.E. 136-3, p. 46, l. 1-4)

At some point during her hospitalization at PCH in either December of 2002 or January of 2003, plaintiff recalls that she told Dr. González that she had used Prednisone before. (D.E. 167-6, p. 2, ¶ 6). Dr. González does not remember if he discussed the side effects of Prednisone with plaintiff. (D.E. 167, ¶ 55; D.E. 175, ¶ 55). Dr. González testified at his deposition that he never offered plaintiff 6 Mercaptopurine ("6MP") or Embrel, alternative medications, because "those are medications used by subspecialists. They are not used by the internal physicians." (D.E. 167, ¶ 62; D.E. 175, ¶ 62). He also testified that Embrel is a drug that is to be used at the chronic level, but not at the acute level. Id.

On January 20, 2003, plaintiff was admitted again to Saint John's Hospital in Santa Monica, where she was diagnosed with chronic ulcerative colitis and a perianal abscess/ fistula. (D.E. 136 ¶ 25; D.E. 167 ¶ 1). At the time of her admission, plaintiff reported that she was taking 20 milligrams of Prednisone per day. (D.E. 136 ¶ 26; D.E. 167 ¶ 13; D.E. 136-4). During that hospitalization, plaintiff was treated with intravenous drugs, including Solumedrol. (D.E. 136-5, p. 1). She had surgery to remove the anal fistula and remained at Saint John's Hospital until January 27, 2003. Id. Mercado was treated with 40 milligrams of Prednisone daily following the surgery. (D.E. 136 ¶ 27; D.E. 167 ¶ 1). She also was given a

prescription for Prednisone upon her discharge. Id. She was instructed to begin with 20 milligrams in the morning and 10 milligrams at night and to eventually reduce the dosage to 5 milligrams every other day. (D.E. 136 ¶ 28; D.E. 167 ¶ 1).

On July 30, 2003, Mercado went to Daniel Freeman Marina Hospital in Marina del Rey, California, because she was having bouts of diarrhea. (D.E. 136 ¶ 29; D.E. 167 ¶ 1). Upon admission to that hospital, the doctor noted that plaintiff had a history of ulcerative colitis, but was not taking any medications. (D.E. 136-6). She was going to be treated with steroids, but she refused them and so she was given antibiotics. (D.E. 136, ¶ 30, D.E. 167 ¶ 14, D.E. 136-6). That same day, her condition improved, and she asked to be discharged so that she could travel to Puerto Rico for her parents' anniversary. Id. Plaintiff was advised not to leave the hospital, and was warned that if she left against medical advice, she would put herself at risk of death, bleeding, infection, and sepsis. (D.E. 136 ¶ 31; D.E. 136-6; D.E. 167, p. 5-6 ¶ 15). After receiving the warnings, plaintiff still wanted to be discharged. Id. The doctor who attended her noted that: "She did request Prednisone and stated that she would follow up with her doctors in Puerto Rico, however, given the fact that this is a toxic medication, and the plaintiff's compliance is not for sure, I have discussed that to arrive first thing tomorrow morning in Puerto Rico and

obtain her medications from her family physician that she would be under the care of [sic]." (D.E. 136-6). The record does not indicate whether plaintiff in fact obtained Prednisone once she arrived in Puerto Rico.

During the July 30, 2003 visit to the Daniel Freeman Marina Hospital, plaintiff also consulted with a gastroenterology specialist. (D.E. 175-3). She told him that she had been taking steroids on and off for the past couple of years and that every time she reduced her dosage of steroids she would get ill again. (D.E. 175-3). She also told the doctor that she had been advised to try 6MP, but she refused for fear of affecting her immune system. Id. The gastroenterologist had a long discussion with plaintiff regarding a treatment plan that included steroids plus Pentasa and 6MP. Id. She would start with 40 milligrams of Prednisone daily and taper down to 20 milligrams until the 6MP started to take effect. Id. Plaintiff said that she would consider it, but was adamant about leaving that night for Puerto Rico. Id.

On August 16, 2003, Mercado went to Cedars Sinai Medical Center in Los Angeles, California, complaining of lower gastrointestinal bleeding. (D.E. 136, ¶ 32; D.E. 167, ¶ 16; D.E. 136-7). Those medical records reflect that she had been taking Prednisone 40 mg once a day prior to her admission. (D.E. 136-7). During that hospitalization, which lasted through

Setpember 8, 2003, plaintiff was given Prednisone. (D.E. 136 ¶ 34; D.E. 167 ¶ 1). At Cedars Sinai Medical Center nobody told Mercado about the side effects of Prednisone. Id. When plaintiff was discharged, she was prescribed various medications, including 25 milligrams of Prednisone per day. (D.E. 136, ¶ 35; D.E. 167, ¶ 17; D.E. 136-7).

From November 18, 2003 until November 21, 2003, Mercado was hospitalized once again at Cedars Sinai Medical Center, with complaints of rectal pain and diarrhea. (D.E. 136 ¶ 41; D.E. 167 ¶ 1). The medical records indicate that plaintiff had been reducing her dosage of steroids since she was discharged from the last hospitalization in September of 2003 and that she had been taking Prednisone since September of 2002. (D.E. 136-8). Plaintiff had reduced her dosage to five milligrams per day and then, a few days before she came to Cedars Sinai on November 18, 2003, had tried to decrease to 2.5 milligrams per day. Id. The treating physician's notes from that date state that plaintiff "says she has a lot of complaints with the Prednisone, including insomnia, mood swings, crying, and more psychiatric features associated with the side effects of steroids." Id. For that reason, she wanted to wean herself off of steroids. Id. A day or two after she had reduced to 2.5 milligrams per day, she began to have severe abdominal pain and severe diarrhea with abdominal bleeding. Id. The doctor concluded that plaintiff

had suffered an exacerbation secondary to the reduction of her Prednisone.  <u>Id.</u>  To treat her, the hospital increased her Prednisone intake from 2.5 milligrams to ten milligrams, but the doctor noted that they would start a steroid enema or suppository since plaintiff was "so reluctant to take oral steroids." (D.E. 136 ¶ 43; D.E. 167 ¶ 1; D.E. 136-8).

From August 16 through August 20, 2004, plaintiff was hospitalized at PCH, where she was attended by co-defendant Dr. Ramos.  (D.E. 136 ¶ 44; D.E. 140 ¶ 4; D.E. 167 ¶ 1; D.E. 169 ¶ 1).  When plaintiff arrived at the emergency room on August 16, 2004, her chief complaints were abdominal pain, nausea, vomiting with blood, and bloody stools.  (D.E. 136 ¶ 45; D.E. 167 ¶ 20).  According to Dr. Ramos's notes from that date, plaintiff was not using any medications for her colitis and she was reluctant to use steroids or to have any procedures such as colonoscopy. (D.E. 136, ¶ 45; D.E. 167, ¶ 20; D.E. 175-1, p. 3).  During that hospitalization, Dr. Ramos did not give plaintiff any kind of steroids.  (D.E. 136 ¶ 51; D.E. 167, ¶ 26).   Instead, she prescribed her Pentasa and antibiotics, which are also used to treat ulcerative colitis. (D.E. 136, ¶ 50; D.E. 167, ¶ 50). When Dr. Ramos discharged Mercado from PCH on August 20, 2004, she did not prescribe her Prednisone or any other type of steroids. (D.E. 136, ¶ 52; D.E. 167, ¶ 27).

On September 11, 2004, Mercado returned to the emergency room at PCH. (D.E. 136, ¶ 53; D.E. 140, ¶ 13; D.E. 167 ¶ 1; D.E. 169 ¶, 1). The physician on call at the emergency room consulted with Dr. Ramos regarding plaintiff's treatment, and, subsequently, plaintiff had an argument with Dr. Ramos about the treatment that she had given her during the previous hospitalization. (D.E. 136, ¶ 54; D.E. 167, ¶ 28).[8] Plaintiff felt that she and Dr. Ramos did not get along and had poor communication. (D.E. 167, ¶ 33; D.E. 167-5). Plaintiff remained hospitalized for two days, during which she received intravenous Solumedrol, but not Prednisone. (D.E. 136, ¶ 55; D.E. 167, ¶ 26; D.E. 167-7, 167-8).

Plaintiff was discharged on September 12, 2004. D.E. 136, ¶ 55; D.E. 167, ¶ 26; D.E. 167-7, 167-8). The discharge sheet completed by Dr. Ramos indicates that "due to concern for the side effects," plaintiff had not used the Pentasa and antibiotics that Dr. Ramos had prescribed her during the last admission because of plaintiff's reluctance to use steroids. (D.E. 175-1, p. 19). That record also shows that plaintiff had,

---

[8] The parties dispute the nature of the argument: Mercado says that she was upset with Dr. Ramos because the previously prescribed medications did not improve her condition. (D.E. 167, ¶ 28). Dr. Ramos and PCH, on the other hand, say that plaintiff complained to Dr. Ramos that the medications she had previously prescribed (Pentasa and antibiotics) were very toxic and that she did not want to use them anymore because she was concerned about the side effects. (D.E. 136, ¶ 54).

on September 11, 2004, requested a dose of intravenous steroids, and that she was "now refusing use of antibiotics and is willing to use [steroids]."  Id.   Upon discharge, Dr. Ramos prescribed plaintiff 40 milligrams of Prednisone per day and advised her to see her gastroenterologist as soon as possible.  (D.E. 136, ¶¶ 55-59; D.E. 167, ¶¶ 26-33; D.E. 167-7, 167-8).  Plaintiff does not remember the duration of the prescription, but Dr. Ramos recalls that she prescribed it only for a short time—just enough to last plaintiff until she could see her gastroenterologist. (D.E. 136-1, p. 37; D.E. 136-9, p. 12).  Dr. Ramos never saw plaintiff in her private office nor did she ever refer plaintiff to PCH.   (D.E. 167, ¶ 41; D.E. 175, ¶ 41).  Dr. Ramos never offered plaintiff 6MP or Embrel (D.E. 167, ¶¶ 45-48).

From September 16, 2004 until October 15, 2004, plaintiff was admitted at Hospital del Maestro in Puerto Rico.  (D.E. 136 ¶ 61; D.E. 167 ¶ 1).   She was given a prescription for Prednisone when discharged.  (D.E. 136 ¶ 62; D.E. 167 ¶ 1). Subsequently, on October 21, 2004, she went to the gastric clinic of the Puerto Rico Medical Center.  (D.E. 136 ¶ 63; D.E. 167 ¶ 1).  At the time she went to the gastric clinic of the Puerto Rico Medical Center, she was taking 35-40 milligrams of Prednisone daily. Mercado visited the clinic again on November 4, 2004, at which time she was taking 35 milligrams of Prednisone.  (D.E. 136 ¶ 64; D.E. 167 ¶ 1).  Plaintiff was also

taking Prednisone on March 31, 2005, when she went to HIMA San Pablo in Fajardo, with a chief complaint of chest pain. (D.E. 136 ¶ 65; D.E. 167 ¶ 1). Although plaintiff had previously been reluctant to use steroids and had complained about side effects from Prednisone, she testified at her deposition that it was not until 2005 that she began to learn about the drug and the side effects it caused by reading information from the internet. (D.E. 167, ¶ 70; D.E. 175, ¶ 70).

From August 7, 2007 through August 10, 2007, plaintiff was admitted to the Stanford Hospital in California, due to bloody diarrhea and abdominal pain. (D.E. 136 ¶ 66; D.E. 167 ¶ 1; D.E. 136-11). She was given a prescription for a low dose of prednisone with intent to taper, but she declined to take it as she said it made her "go crazy." (D.E. 136, ¶ 67; D.E. 167, ¶ 35; D.E. 167-11). Plaintiff was seen again at PCH on March 26, 2006, at which time the records indicate that she had taken steroids for a long period and had osteoporosis. (D.E. 167, ¶ 39; D.E. 175, ¶ 39).

Plaintiff did not always buy and take Prednisone every time it was prescribed to her. (D.E. 136 ¶ 40; D.E. 167 ¶ 1). She does recall, however, that she bought the prescription on at least two occasions in California: once in the Marina del Rey Hospital and once in Cedars Sinai Medical Center in 2002 or 2003. (D.E. 136 ¶ 36; D.E. 167 ¶ 1). She also recalls buying

Prednisone on three or four occasions in Puerto Rico. (D.E. 136 ¶ 38; D.E. 167 ¶ 1). Plaintiff is also aware that pharmacies give literature about medication when it is purchased. (D.E. 136 ¶ 38; D.E. 167 ¶ 1). However, and notwithstanding her reluctance to take steroids, antibiotics, or Pentasa when she was treated by Dr. Ramos at PCH, plaintiff stated at her deposition that "[i]f the doctor prescribes [a medication] to me I have to take it," and, for that reason, she never reads the accompanying literature. (D.E. 136 ¶ 38; D.E. 167 ¶ 1; D.E. 136-1, p. 121),

Whenever plaintiff was prescribed Prednisone, it was usually in decreasing doses, such that she would start with a higher dose and eventually decrease the dosage. (D.E. 167-2, p. 28). Also, it was always prescribed for a limited time subsequent to a hospital admission. (D.E. 167-2, p. 29, l. 14-16). Plaintiff's deposition testimony varied, however, as to how long Prednisone was usually prescribed to her. She initially stated that upon release from the hospital, it was usually prescribed for two or three weeks. (D.E. 167-2, p. 31; cited by defendants at D.E. 136 ¶ 39). However, during the same deposition, she later testified that it was sometimes prescribed for longer periods of time, specifically, two or three months. (D.E. 167-2, p. 28, l. 24; cited by plaintiff at D.E. 167 ¶ 18).

**DISCUSSION**

As a threshold matter, the Court notes that PCH's objections to the Report are out of order with the sequence of issues addressed by the Magistrate Judge. In the interest of clarity, however, the Court will address PCH's objections as they appear in that motion.

Vicarious Liability of PCH

PCH argues that since they presented arguments showing that Plaintiff failed to establish her claim of lack of informed consent against the doctors, the claim against PCH must be dismissed as well because it is grounded on a theory of vicarious liability. While the Magistrate Judge found Plaintiff had failed to prove her claim for lack of informed consent against Dr. Gonzalez, the same could not be said about Dr. Ramos. The Magistrate Judge found that triable issues remain as to whether Dr. Ramos failed to obtain Plaintiff's informed consent.

Nevertheless, as a matter of law, PCH may not be found liable to Plaintiff through the conduct of Dr. Gonzalez. Accordingly, PCH's motion for summary judgment is hereby GRANTED on the question whether the hospital is vicariously liable to plaintiff through the conduct of Dr. Gonzalez. On everything else, as discussed in further detail below, it is denied.

<u>Dr. Ramos's Failure to Obtain Informed Consent</u>

Next, PCH objects to the Magistrate Judge's determination that Dr. Ramos failed to obtain Plaintiff's informed consent. The Magistrate Judge made this determination on the basis that there was a genuine dispute on the record as to whether Dr. Ramos knew Plaintiff had previously used Prednisone.

PCH posits that the Magistrate Judge erred in his application of <u>Sepúlveda de Arrieta v. Barreto</u>, 1994 P.R.-Eng. 908,876; 137 D.P.R. 735 (1994), where the Supreme Court "spoke at length about the scope of physicians' duty to inform, as well as the nature of the proximate cause element." (Docket No. 194, p. 15). Specifically, PCH contends that the issue under <u>Sepulveda</u> is not (as the Magistrate Judge understood) whether Dr. Ramos knew or not of Plaintiff's previous usage of Prednisone. Rather, the question to be addressed by the Court is whether *Plaintiff herself* knew of the possible side effects of Prednisone prior to receiving treatment by the doctor. The Court disagrees.

In <u>Sepulveda</u>, the Supreme Court of Puerto Rico stated that a physician need not disclose medical risks from a certain treatment to a patient who has knowledge of those risks because he or she has received that treatment in the past. In that case, however, the court held that when a physician is providing a

purely cosmetic treatment to a patient, "the physician would have [a duty] to disclose those risks as required by the prevailing medical practice." Sepulveda, 137 D.P.R at 753. The Sepulveda court then applied that standard to the facts before it and held that the patient should have been informed of the complications that could potentially arise from the cosmetic surgery she underwent. However, nothing was said about the patient having had that surgery or treatment beforehand. Therefore, whether the plaintiff in Sepulveda had or had not received similar treatment in the past was not at issue. Accordingly, since the statement on which PCH relies on was "not essential to the determination of the legal questions before the court," it is merely *obiter dicta* and not the stuff of binding precedent.[9] Arcam Pharm. Corp. v. Faria, 513 F.3d 1, 3 (1st Cir. 2007).

Even if Sepulveda's statement was somehow binding, the Court disagrees with the Hospital's expansive reading of it. This statement, like any other, must be read in its context. It would certainly be absurd to construe Sepulveda as giving a free pass to doctors who roll the dice and choose not to obtain a patient's informed consent on the gamble that the patient had

---

[9] The Supreme Court of Puerto Rico made a similar pronouncement in Rodriguez Crespo v. Hernandez, 121 D.P.R. 639, 665 (1988). In that case, like in Sepulveda, the statement was unnecessary for the court's holding as well.

used the medication before.[10] Even so, as Sepulveda, Rodriguez-Crespo, and the myriad other Puerto Rico Supreme Court cases show, the duty to obtain the informed consent of a patient lies exclusively with the doctor. Therefore, the Court agrees wholeheartedly with the Magistrate Judge's conclusion that summary judgment is inappropriate where there are triable issues as to whether Dr. Ramos knew that Plaintiff had used Prednisone in the past.

Causation

Lastly, PCH rehashes its argument that Plaintiff's cause of action must be dismissed because she has failed to show that the proximate cause of her injuries was the lack of disclosure by Dr. Ramos. The Court has reviewed this argument and finds it without merit. There is sufficient basis on the record, as found by the Magistrate Judge, to find summary judgment improper because genuine issues of fact exist as to causation.

**CONCLUSION**

After conducting *de novo* review and finding the Magistrate Judge's Report and Recommendation well-founded in both the

---

[10] The Court thinks it is more reasonable to read Sepulveda as recognizing that it would be superfluous for a doctor -*who already knows that the patient has used similar medication in the past*- to parrot the same information to the patient once more. But that is merely the Court's best guess as to what the Supreme Court meant in that case. In any event, guesswork is unnecessary as PCH has failed to produce a single case in which Sepulveda's statement was applied to the facts at hand.

record and in the law, the Court hereby **ADOPTS** the Report and accordingly **DENIES** both motions for summary judgment. However, as stated above, the Court **GRANTS** summary judgment in favor of PCH on the question whether it is vicariously liable to plaintiff through the conduct of Dr. Gonzalez.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 27th day of September, 2012.

S/ Jay A. Garcia-Gregory
JAY A. GARCIA-GREGORY
United States District Judge